**CASE NUMBER 24-10818-D**

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

SJK, JMW #1, and JMW #2, Minor Children of Julia Moss, Deceased, by
**REICO WATTS**, as Their Parent and Natural Guardian, and
DWIGHT MOSS as Personal Representative of the Estate of Julia Moss,

Plaintiffs/Appellants

v.

**OCONEE COUNTY SHERIFF JAMES A. HALE, JR.**,
in His Official Capacity, and DEPUTIES ANDREW R. HENDERSON
and STANLEY M. SWISHER in Their Individual Capacities,

Defendants/Appellees

---

ON DIRECT APPEAL FROM A FINAL ORDER
OF THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA

---

**BRIEF OF APPELLANTS**

---

CRAIG T. JONES
Georgia Bar No. 399476
Craig T. Jones, P.C.
Post Office Box 66
Savannah, Georgia 31402
(678) 643-0062
craigthomasjones@outlook.com

*Attorney for Appellants*

No. 24-10818-D
*Watts v. Hale*
C-1 of 2

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to 11th Cir. R. 26.1-1(a)(2), the following is a complete list of the trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held company that owns 10% or more of the party's stock, and any other identifiable legal entities related to a party:

ACCG-IRMA

Babcock, Ryan and The Babcock Law Firm, P.C.

Estate of Julia Moss, Deceased

Hale, Sheriff James A., Jr.

Henderson, Andrew R.

Jones, Craig T. and Craig T. Jones, P.C.

Land, Hon. Clay D.

Minor children of Julia Moss

Moss, Dwight Moss

Moss, James

Oconee County, Georgia

Swisher, Stanley M.

2

No. 24-10818-D
*Watts v. Hale*
C-1 of 2

Watts, Reico

Williams, Terry

Williams & Waymire, LLC

Williams & Waymire, P.C.

Respectfully submitted this 5th day of April, 2024.

*/s/ Craig T. Jones*
CRAIG T. JONES
Georgia Bar No. 399476
Counsel for Appellants

CRAIG T. JONES, P.C.
Post Office Box 66
Savannah, Georgia 31402
(678) 643-0062
craigthomasjones@outlook.com

# **TABLE OF CONTENTS**

Certificate of Interested Parties and Corporate Disclosure Statement………...........2

Table of Contents……………………………………………………….…...……4

Table of Authorities………………………………….....................................6

Statement Regarding Oral Argument…………………………………………..10

Statement of Jurisdiction……………………………………………….....10

Statement of the Issues ……………………………………………………...11

Statement of the Case………………………………………………………..12

    Nature of Case……………………………………………………………12

    Course of Proceedings and Dispositions in the Court Below……………….12

    Statement of the Facts……………………………………………………13

    Standard of Review………………………………………………………18

Summary of Argument ......................................... …………………………18

Argument and Citation of Authority............... …………………………………21

  A. Reasonable jurors could find a violation of clearly established Fourth
     Amendment law……………………………………………………………21

  *1. Viewing the facts in the light most favorable to Plaintiffs, Julia Moss was*
     *seized unreasonably in the manner she was detained and by the use of*
     *deadly force against her*……………………………………………………21

  *2. The applicable Fourth Amendment law is clearly established, and the*
     *Defendant deputies are not entitled to qualified immunity when the facts are*
     *viewed most favorably to Plaintiffs*……………………………………...23

B. Reasonable jurors could find that Defendants failed to make reasonable accommodation for an obvious mental disability under the ADA…………26

C. Reasonable jurors could find that the Defendant deputies committed state law torts and constitutional violations for which they are not entitled to official immunity……………………………………………………………...32

   1. *State law tort claims*………………………………………………………..32

   2. *State constitutional claims*…………………………………………………35

Conclusion…………………………………………………………………...41

Certificate of Compliance…………………………………………………....42

Certificate of Service………………………………………………………...43

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Adams v. Hazelwood*, 271 Ga. 414, 520 S.E. 2d 896 (1999)……………………...34

*Allmond v. Akal Sec., Inc.*, 558 F. 3d 1312 (11th Cir. 2009)……………………...27

*Anderson v. Creighton*, 483 U.S. 635 (1987)………………………………………..24

*Bohanan v. Paulding Cnty.*, 479 F. Supp. 3d 1345 (N.D. Ga. 2020)……………..35

*Brower v. County of Inyo*, 489 U.S. 593 (1989)………………………………………..21

*Calderin v. Miami–Dade Police Dep't*, 600 F. App'x 691 (11th Cir. 2015)……..25

*City and County of San Francisco v. Sheehan*,
    575 U.S. ___, 135 S. Ct. 1765 (2015)…………………………………………27, 29

*Clawson v. Rigney*, 777 F. App'x 381 (11th Cir. 2019)………………………….25

*Collins ex rel. Deloach v. Schantz*, No. A23A0741
    (Ga. App. 9/26/2023), *cert. denied* (Ga. 2024)……………………………..36

*Cruet v. Emory University*, 85 F. Supp. 2d 1353 (N.D. Ga. 2000)………………..40

*Dekalb County v. Bailey*, 319 Ga. App. 278, 736 S.E.2d 121 (2012)…………….35

*Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567 (5th Cir. 2002)……………………..29

*Draper v. Reynolds*, 278 Ga. App. 401, 629 S.E.2d 476 (2006)…………………..36

*Duvall v. Cnty. of Kitsap*, 260 F.3d 1124 (9th Cir. 2001)………………………...29

*Dyksma v. Pierson*, No. 4:17-cv-00041-CDL (M.D. Ga.  7/16/2018),
    *affirmed per curiam*, No. 18-13337 (11th Cir. 4/18/2019)……………...35-37

*Gardner v. Rogers*, 224 Ga. App. 165, 480 S.E.2d 217 (1996)……………….33-35

*Georgia R. & Banking Co. v. Sewell*, 57 Ga. App. 674, 196 S.E. 140 (1938)…....39

*Graham v. Connor*, 490 U.S. 386 (1989)……………………………………………21

*Greer v. Ivey*, 767 F. App'x 706 (11th Cir. 2019)……………………………...25

*Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000)……………………………..30-31

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)……………………………………….24

*Harris v. Hall*, No. 7:21-CV-00608-LSC,
2022 WL 2211527 (N.D. Ala. 6/21/2022)…………………………………25

*Haves v. City of Miami*, 52 F.3d 918 (11th Cir. 1995)…………………………18

*Hernandez v. City of N. Miami Beach, Fla*., No. 08-20724-CIV,
2009 WL 10700664 (S.D. Fla. 8/27/2009)…………………………………26

*Hope v. Pelzer*, 536 U.S. 730 (2002)……………………………………………..24, 29

*Ingram v. Kubik,* 30 F.4th 1241 (11th Cir. 2022)………………………………..28, 31

*Jones v. City of Detroit*, 815 F. App'x 995 (6th Cir. 2020)………………………29

*Kidd v. Coates*, 271 Ga. 33, 518 S.E. 2d 124 (1999)…………………………..33-35

*Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002)…………………………………22

*Lee v. Russ*, 33 F.4th 860 (6th Cir. 2022)……………………………………………25

*Lou v. Lopinto*, No. 2:21-cv-00080-WBV-DPC (W.D. La. 05/12/23)……………29

*Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) (*en banc*)………………………31

*McKinney by McKinney v. DeKalb Cty.*, 997 F.2d 1440 (11th Cir. 1993)……….25

*Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005)………………..22, 24

*Merrow v. Hawkins,* 266 Ga. 390, 467 S.E. 2d 336 (1996)………………………34

*Monell v. Dept. of Social Services*, 436 U.S. 658 (1978)…………………………....31

*Nat'l Ass'n of the Deaf v. Florida*, 980 F.3d 763 (11th Cir. 2020)………………..31

*Paul v. Davis*, 424 U.S. 693 (1976)………………………………………………….37

*Pearson v. Callahan*, 555 U.S. 223 (2009)………………………………………...23, 41

*Porter v. Massarelli*, 303 Ga. App. 91, 692 S.E.2d 722 (2010)…………....32, 35-36

*Phong Duong v. Telford Borough*, 186 F. App'x 214 (3d Cir. 2006)…………….25

*Reyes v. Bridgwater*, 362 F. App'x 403 (5th Cir. 2010)………………………….25

*Rosen v. Montgomery Cnty.*, 121 F.3d 154 (4th Cir. 1997)………………………29

*Saucier v. Katz*, 533 U.S. 194 (2001)……………………………………………23, 41

*Teel v. Lozada*, 826 F. App'x 880 (11th Cir. 2020)……………………………….24

*Tennessee v. Garner*, 471 U.S. 1 (1985)…………………………………………21-22

*Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002)………………………………24

*Walker v. Oglethorpe Power Corp.*, 341 Ga. App. 647, 802 S.E.2d 643 (2017)…39

*Wells Fargo Bank, N.A. v. Jenkins*, 293 Ga. 162, 744 S.E.2d 686 (2013)………..40

*Wilson v. Layne*, 526 U.S. 603 (1999)……………………………………………….26

*Windham v. Harris Cty.*, 875 F.3d 229 (5th Cir. 2017)…………………………...30

FEDERAL STATUTES, RULES AND CONSTITUTIONAL PROVISIONS

Fourth Amendment ………………………………...……10-12, 20-23, 28, 32, 41

28 U.S.C. §1291……………………………………………………………………..11

28 U.S.C. §1331……………………………………….…………………………10

28 U.S.C. §1332……………………………………………………………………..10

28 U.S.C. §1367……………………………………………………………………..10

42 U.S.C. §1983…………………………………………………………....36, 38-39

42 U.S.C. §12132…………………………………………………………………27

Americans with Disabilities Act……………………………….10-12, 20, 26-29, 31

Rehabilitation Act of 1973…………………………………………………………..27

## GEORGIA STATUTES AND CONSTITUTIONAL PROVISIONS

GA. CONST. Art. 1, §1, ¶1…………………………………………………..….36

GA. CONST. Art. 1, §1, ¶17…………………………………………………..….32

O.C.G.A. §16-3-21…………………………………………………………32-33

O.C.G.A. §51-1-1……………………………………………………37, 39-40

O.C.G.A. §51-1-6………………………………………………..….38-40

O.C.G.A. §51-1-7…………………………………………………………………39

O.C.G.A. §51-1-13………………………………………………………..32

O.C.G.A. §51-1-14………………………………………………………..32

## TREATISES

Adams & Adams, Ga. Law of Torts (1998 ed.), §1.2(b)…………………………39

## STATEMENT REGARDING ORAL ARGUMENT

Appellants request oral argument.  This case involves issues of federal and state law regarding the proper use of deadly force by law enforcement, which is evaluated under different standards and subject to different defenses – meaning that a use of force permitted by federal law and subject to federal qualified immunity may not be proper under Georgia law or protected by its doctrinally distinct defense of official immunity.  This case also addresses how mental disability should be taken into account when law enforcement responds to a potential threat which is not necessarily an imminent lethal one.  In addition to the Fourth Amendment reasonableness implications of using deadly force against the disabled, this case also raises a claim under the Americans with Disabilities Act (ADA) which addresses the duty of law enforcement officers to reasonably accommodate a known or obvious disability.  There is a split between the Circuits on whether a local government entity has *respondeat superior* liability for ADA violations by its employees, and oral argument would aid the decisional process in further developing that body of law.

## STATEMENT OF JURISDICTION

**A.    Basis for District Court's Subject Matter Jurisdiction.**

The District Court had subject matter jurisdiction over the instant case pursuant to 28 U.S.C. §§1331, 1332, and 1367.

**B.    Basis for Appellate Court's Subject Matter Jurisdiction.**

This is a direct appeal from a final judgment of the District Court, for which this Court has subject matter jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1)    Whether reasonable jurors could find that excessive and disproportionate force was used when police shot and killed a mentally ill woman holding a dull-edged sheetrock tool who did not pose an imminent lethal threat to officers who could have immobilized and restrained her without resort to deadly force, and whether such force amounted to an unreasonable seizure under clearly established principles of Fourth Amendment law for which there is no qualified immunity.

2)    Whether reasonable jurors could find that the failure of deputy sheriffs to make reasonable accommodation for a suspect's obvious mental disability by escalating their response to a deadly force confrontation - rather than using widely taught de-escalation and crisis intervention techniques to avoid orphaning her children - is an ADA violation for which both the deputies and the sheriff who employs them can be held liable for damages.

3)    Irrespective of federal law, whether reasonable jurors could find that officers are liable under Georgia law for unnecessarily using deadly force under circumstances where other options are available, since deadly force is only

authorized where it is both reasonable and necessary, and the use of unnecessary force amounts to actual malice or intent to injure that is outside the scope of official immunity under state law.

## STATEMENT OF THE CASE

### Nature of Case

This is a direct appeal from a grant of summary judgment in a federal civil rights action against two deputy sheriffs for the use of excessive force in violation of the Fourth Amendment, which also asserts an ADA claim against their employer for failing to make reasonable accommodation for the suspect's mental disability, as well as pendent state law claims against the deputies individually.

### Course of Proceedings and Disposition in the Court Below

Plaintiff/Appellant Reico Watts filed a Complaint on behalf of the minor children of Julia Moss, deceased, against the sheriff of Oconee County and two of his deputies in the Middle District of Georgia on September 17, 2022.  (R. 1). Defendants/Appellees filed a timely Answer on October 26, 2022. (R. 4).  On May 19, 2023, Plaintiffs filed a motion for leave to amend the Complaint by adding the Administrator of Julia's estate, Dwight Moss, as a Plaintiff, which was unopposed and granted on May 22, 2023.  (R. 12, 13, 14).  On September 8, 2023, Defendants filed a motion for summary judgment (R. 24), which was granted as to all claims in a final Order and Judgment entered on March 8, 2024.   (R. 36, 37). Plaintiffs filed

a timely Notice of Appeal to this Court on March 14, 2024 (R. 39).

## Statement of the Facts

In response to Defendants/Appellees' motion for summary judgment, Plaintiffs/Appellants provided the following statements of material fact as to which there are genuine issues to be tried:

1.

Julia Moss went home with Cory Borst and then would not leave when he asked her to, after which she became combative and began acting "crazy." [R. 25, Borst 911 call].[1]

2.

Upon arrival at the scene, Borst told Deputy Henderson that Ms. Moss was "delusional" and "out of her mind," which was confirmed in the officers' presence by her irrational comments and bizarre behavior. [R. 31-2 at 3-4; R. 25, Henderson Video 3:24 and 4:10].

3.

Recognizing her mental instability, the officers radioed the dispatcher for an ambulance and were aware that an ambulance was on the way, but rather than waiting and leaving her alone in the back bedroom, they approached her and stood in the open doorway. [R. 26 at 34-43; R. 27 at 45].

4.

In the words of Deputy Swisher, "When I called for EMS, I was thinking 100-percent mental patient." [R. 27 at 55].

5.

Prior to this incident, Deputies Henderson and Swisher had both received academy training and yearly updates on de-escalation techniques. [R. 26 at 7-10; R. 27 at 27).

---

[1] The recording of the 911 call as well as the bodycam videos of Deputies Henderson and Swisher were manually filed by Defendants' counsel and are in the record.

6.

Deputy Swisher has also received crisis intervention ("CIT") training. [R. 27 at 52; R. 29 at 27-30].

7.

The incident that is the subject of this lawsuit occurred on September 21, 2020, at approximately 9:45 a.m., when deputies from the Oconee County Sheriff's Department responded to 101 Creek View Court to a report of a domestic dispute. The entire incident was recorded by the body cameras of both deputies. [R. 31-2 at 3; R. 25, Henderson and Swisher Videos].

8.

Deputy Andrew Henderson was the first to arrive and was met outside by the complainant, Cory Borst. Borst stated that the previous day he had picked up a known acquaintance, Julia Moss, to bring her back to his house for the night. Borst stated that shortly before his 911 call, Moss had gotten upset and chased him out of the house with a knife. Moss also allegedly struck Borst in the head with a pole and either stabbed or attempted to stab his dog. There was a minor wound visible on Borst's forehead. While Henderson was talking to Borst, Deputy Stanley Swisher arrived at the residence. [R. 31-2 at 3; R. 25, Henderson and Swisher Videos).

9.

Within minutes, Henderson and Swisher entered the house to confront Moss. Moss could be heard in a back bedroom talking to herself about someone named "Tosha." Moss opened the door to the bedroom and began talking irrationally, telling Henderson, "I know you're Mario Andretti, now get out of my house." She also referenced a "zombie apocalypse" and "Elohim." She then shut the door. [R. 31-2 at 3; R. 25 at Henderson and Swisher Videos].

10.

Rather than standing back, discussing the situation, and waiting for the ambulance to arrive, the deputies at time the two deputies moved forward and opened the door. They found Moss standing and holding a small sheetrock saw and a lit propane torch. Henderson immediately drew his weapon and said, "I will shoot you!" Moss immediately sat on the floor and turned the torch off and dropped it. She continued to hold the saw. The deputies then began commanding her at gunpoint to

drop the saw and remained in the doorway. [R. 31-2 at 3-4; R. 25, Henderson and Swisher Videos].

11.

For the next several minutes, the deputies maintained their position at the door and repeatedly commanded Moss to drop the "knife" in reference to the sheetrock saw she was still holding her hand. Throughout the exchange, Moss was emotionally escalated and talking irrationally. At times she would calm down for short periods while sitting on the floor against the bed but would again become agitated. [R. 31-2 at 4; R. 25, Henderson and Swisher Videos).

12.

On two occasions she asked if she could call someone to intervene, and the deputies either missed or ignored those cues which could have made a difference between life and death in this case. At 14:40 on Henderson's bodycam video, she says "I need to call someone I know." Then again at 15:25, she asks to "call someone who can help." They did not accommodate these requests, when a reasonable officer with CIT training would have done so. [R. 31-2 at 4; R. 25, Henderson and Swisher Videos].

13.

Eventually she stood and began to throw and push items in the room and appeared to at least attempt to exit through a window. She then turned and began moving in the direction of the door but not directly at the deputies, both of whom held their positions—Henderson in front aiming his firearm, and Swisher behind him with his Taser in his hand. [R. 31-2 at 4-5; R. 25, Henderson and Swisher Videos].

14.

As she approached the area of the doorway, Henderson fired his weapon six times, striking Moss multiple times. She did not survive her wounds. [R. 31-2 at 5; R. 25, Henderson and Swisher Videos].

15.

Prior to the shooting, the bodycam video (as well as the officers' deposition testimony) indicates there was no communication between Henderson and Swisher about whether to use the Taser instead of the

firearm, or whether to withdraw from the room and leave her alone until the ambulance arrived, which they knew was in route. [R. 31-2 at 5; R. 25, Henderson and Swisher Videos].

16.

There was also no conversation about whether to accommodate her reasonable request to call someone she knew who might be able to calm the situation, or to have the officers call on her behalf.  [R. 25 at 5; R, 25, Henderson and Swisher Videos].

17.

There was also no audible warning given by Henderson that he intended to fire his weapon once he decided to do so.  [R. 31-2 at 5; R, 25, Henderson and Swisher Videos].

18.

Plaintiff's expert William Harmening opines as follows based on his review of the video and his decades of training and experience in both law enforcement and forensic psychology:

> Throughout this incident, Henderson and Swisher failed to consider Moss's obvious mental problems and remained in position at the door with their weapons drawn and on target. At that point there was nothing to be gained by not backing down the hallway to give Moss some space. It is unknown what they hoped to accomplish. To remain in place almost guaranteed that Moss would be shot if she moved in the deputies' direction. Their ability to retreat down the hallway, even when Moss moved toward their location, made the shooting unnecessary at the time it occurred. **The deputies failed to respond to the incident as a crisis intervention of someone likely in need of an involuntary psychiatric evaluation. Instead, they ignored their training and confronted Moss as a criminal suspect even before a proper investigation was completed to determine if there was probable cause for an arrest. They made no effort to de-escalate Moss, and instead only escalated her agitation, which ultimately led Deputy Henderson to use deadly force at a time when**

**there was no imminent lethal threat.** [R. 31-2 at 13-14].

(R. 31-3) (emphasis added).

Viewing the foregoing facts in the light most favorable to the Plaintiffs as required by Rule 56, it is fair to say that Ms. Moss went home with Mr. Borst and then would not leave the next morning when he asked her to, after which she became combative and begin making bizarre statements. Borst called the police and told them upon arrival she was "delusional" and "out of her mind," which was confirmed in the officers' presence by her irrational comments and bizarre behavior. (R. 31-2 at 3-4; R. 25, Henderson Video 3:24 and 4:10).

Recognizing her mental instability, the officers radioed the dispatcher for an ambulance and were aware that an ambulance was on the way, but rather than waiting and leaving her alone in the back bedroom where she had isolated herself, they approached her and stood in the doorway. (R. 26 at 34-43; R. 27 at 45). In the words of Deputy Swisher, "When I called for EMS, **I was thinking 100-percent mental patient**" (R. 27 at 55, emphasis added), yet neither of the deputies treated her as one.

At one point she asked them if she could call someone she knew for assistance – not once but twice – and the deputies failed to accommodate either request. (R. 25, Henderson Video 14:40, 15:25; R. 31-2 at 4). Rather than using de-escalation techniques in which they were trained to calm down a mentally

unbalanced person, they repeatedly shouted commands and provoked her to come toward them while holding a small sheetrock saw in her hand.  Rather than taking advantage of the fact that two large men could have easily overpowered one small woman with raw physical force, or disabled her temporarily with a Taser, Deputy Henderson fired six rounds from his pistol and shot her dead. (R. 31-2 at 3-5; R. 25, Henderson and Swisher Video). Reasonable jurors could find that there were alternative ways of handling the situation and that a reasonable officer would have done so differently.

## Standard of Review

This Court reviews the decision to grant summary judgment *de novo*, applying the same legal standards which bound the district court. *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).

## SUMMARY OF ARGUMENT

This case arises from the tragic death of a young mother who was shot by an Oconee County deputy sheriff while in the throes of a mental health crisis. Reasonable minds can view police video of the shooting and reach different conclusions about whether she posed a lethal threat to anyone, and reasonable minds – including the law enforcement experts hired by both sides – can also disagree about whether shooting her dead was a reasonable response to any perceived threat, which is why this case must be decided by a jury.

It has been said that this country is experiencing a mental health crisis, and published research reports that over 20% of all adults – more than 50 million Americans (including one of the undersigned counsel's four sons) – are inflicted with some form of mental illness.  https://www.mhanational.org/issues/state-mental-health-america.  All too often, law enforcement officers find themselves on the front lines of this epidemic, which is why police academies now give intensive training in crisis intervention ("CIT" in police lingo) and de-escalation techniques. Plaintiffs' expert William Harmening is uniquely qualified to address this subject based on his decades of training and experience in both forensic psychology and law enforcement.  Sadly, however, Plaintiff's decedent is *not* a unique example of the tragic outcomes that can occur when police fail to apply CIT and de-acceleration principles which have come to be engrained in the generally accepted practices of the law enforcement profession.

Plaintiffs are the orphaned children of Julia Moss, pictured with her below:



(R. 1 at 4).

Through this lawsuit, they have brought three discrete categories of claims against the Sheriff of Oconee County, Georgia and two of his deputies:

1) A Fourth Amendment claim for unreasonable seizure due to the inappropriate use of deadly force and the failure to use de-escalation techniques in the course of detaining and apprehending a person in obvious mental health crisis;

2) A claim under Title II of the Americans with Disabilities Act ("ADA") for failing to make reasonable accommodation for Ms. Moss's obvious psychiatric disability by provoking rather than calming her, refusing her request to call someone for assistance, and failing to stand back and await the arrival of medical professionals whom the deputies had already called to the scene; and

3) Pendent state law tort claims for battery, negligence, and violations of the Georgia Constitution which are governed by different elements and defenses than the federal claims asserted by Plaintiffs.

When the facts are viewed in the light most favorable to Plaintiffs as the nonmoving party on summary judgment, the case must proceed to trial on at least one of the foregoing theories of recovery for reasons set forth in the legal argument below.

## ARGUMENT AND CITATION  OF AUTHORITY

### A. Reasonable jurors could find a violation of clearly established Fourth Amendment law

*1. Viewing the facts in the light most favorable to Plaintiffs, Julia Moss was seized unreasonably in the manner she was detained and by the use of deadly force against her.*

The Fourth Amendment prohibits unreasonable seizures.  A seizure is defined as "when there is a governmental termination of freedom of movement through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593 (1989).  Accordingly, a seizure occurs when officers give commands to a suspect and block her ability to escape, thereby restricting her liberty and making it clear that she is not free to leave.  A seizure also occurs when deadly force is used by police while apprehending or detaining a suspect. *Tennessee v. Garner*, 471 U.S. 1 (1985); *Graham v. Connor*, 490 U.S. 386 (1989).  In determining whether a given stop, detention, or use of force violates the Fourth Amendment, the standard is objective reasonableness based on the facts and circumstances known or knowable to a reasonable officer at the scene.  In this case, all relevant facts and circumstances are visible on video, and the issue on summary judgment is whether that video can be interpreted in such a way that jurors could find the police conduct to be unreasonable. Under *Graham*, the determination of reasonableness must be based on the "totality of the circumstances."  490 U.S. at 396. That would include

21

the obvious mental state of Julia Moss, who was described by the man who complained about her to the deputies as "delusional" and "out of her mind" – which was also readily apparent to the deputies who called an ambulance for her. It was unreasonable for the deputies to ignore that circumstance by failing to apply de-escalation techniques in which they had both been trained – as well as CIT principles in which Deputy Swisher had been trained – and instead resorting to provocative behavior that led unnecessarily to a deadly force confrontation.

Because "'a reasonable officer would [not] believe that this level of force [wa]s necessary in the situation at hand'" taking proper consideration of "alternative actions" that "were available means of resolving the situation," the use of deadly force violated the Fourth Amendment. *Mercado v. City of Orlando*, 407 F.3d 1152, 1157–58 (11th Cir. 2005) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002)). Even where deadly force is authorized, officers are required to give warning "where feasible" of their intent to use deadly force before doing so, which did not happen here. *Garner*, 471 U.S. at 11-12.

In the words of Plaintiff's expert,

Throughout this incident, Henderson and Swisher failed to consider Moss's obvious mental problems and remained in position at the door with their weapons drawn and on target. At that point there was nothing to be gained by not backing down the hallway to give Moss some space. It is unknown what they hoped to accomplish. To remain in place almost guaranteed that Moss would be shot if she moved in the deputies' direction. Their ability to retreat down the hallway, even

when Moss moved toward their location, made the shooting unnecessary at the time it occurred. The deputies failed to respond to the incident as a crisis intervention of someone likely in need of an involuntary psychiatric evaluation. Instead, they ignored their training and confronted Moss as a criminal suspect even before a proper investigation was completed to determine if there was probable cause for an arrest. They made no effort to de-escalate Moss, and instead only escalated her agitation, which ultimately led Deputy Henderson to use deadly force at a time when there was no imminent lethal threat.

(R. 31-2 at 13-14). This is sufficient to give rise to a jury question as to whether Julia Moss was seized unreasonably in violation of the Fourth Amendment.

2. *The applicable Fourth Amendment law is clearly established, and the Defendant deputies are not entitled to qualified immunity when the facts are viewed most favorably to Plaintiffs.*

Having answered the threshold question of whether the evidence supports a Fourth Amendment violation, the inquiry turns to whether the conduct of the officers in this case – if found to be as alleged by Plaintiffs – violates clearly established principles of Fourth Amendment law. *Saucier v. Katz*, 533 U.S. 194 (2001) (directing courts to address those questions in sequential order), *as modified by Pearson v. Callahan*, 555 U.S. 223 (2009) (allowing courts to address those questions in the order they see fit). In the absence of clearly established law at the time of the conduct in question, the individual officers are entitled to qualified immunity, which protects public officials from monetary liability when their conduct does not violate "clearly established statutory or constitutional rights of

which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), cited in *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). For the law to be clearly established, it is not necessary to show that "the very action in question has been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

> [I]f some authoritative judicial decision decides a case by determining that "X Conduct" is unconstitutional without tying that determination to a particularized set of facts, the decision on "X Conduct" can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding "X Conduct" are immaterial to the violation. These judicial decisions can control "with obvious clarity" a wide variety of later factual circumstances."

*Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002).

Long before the subject incident in September 2020, the Eleventh Circuit had repeatedly held that a jury could reasonably find deadly force was unreasonable where a subject holds a knife, and refuses commands to drop it, but does not make an imminently threatening move to use the knife or charge at officers. *See Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005) (denying qualified immunity for shooting sage launcher at suicidal person who refused commands to drop knife); *Teel v. Lozada*, 826 F. App'x 880, 883 (11th Cir. 2020) (denying qualified immunity where suspect "gradually" walked toward officer with eight-inch blade but "never made a sudden movement or ran or lunged . . . or

point[ed] the knife in [the officer's] direction"); *Clawson v. Rigney*, 777 F. App'x 381, 385 (11th Cir. 2019) (denying qualified immunity where subject walked towards an officer holding eight-inch blade); *Greer v. Ivey*, 767 F. App'x 706, 710–11 (11th Cir. 2019) (denying qualified immunity where subject possessed two large knives in tight hallway exchange with law enforcement); *Calderin v. Miami–Dade Police Dep't*, 600 F. App'x 691, 696 (11th Cir. 2015) (denying qualified immunity for officer who shot suspect who did not make any threatening movements towards the police despite refusal to comply with commands to drop thirteen-inch knife); *McKinney by McKinney v. DeKalb Cty.*, 997 F.2d 1440, 1443 (11th Cir. 1993) (denying qualified immunity where barricaded teen held or had immediate access to knife).[2]

---

[2] While not binding authority on this Court, there is also a consensus of authority from other district courts which evidence the extent to which the law is established on when it is proper to shoot someone holding a knife or other bladed instrument. *See, e.g.*, *Lee v. Russ*, 33 F.4th 860, 863 (6th Cir. 2022) (denying qualified immunity where man who had robbed pharmacy refused to drop knife and then "made one step sideways" towards officer because "[t]his was not a threatening advance or at least that is what a jury could find on this record"); *Reyes v. Bridgwater*, 362 F. App'x 403, 404–05 (5th Cir. 2010) (denying qualified immunity where officer shot a person holding a kitchen knife in his apartment entryway, even though he refused to follow the officer's multiple commands to drop the knife); *Phong Duong v. Telford Borough*, 186 F. App'x 214, 217 (3d Cir. 2006) (denying qualified immunity after shooting of man with knife who had chased people where the knife was "pointed away" from officer and there was a distance of 13 feet between officer and subject); *Harris v. Hall*, No. 7:21-CV-00608-LSC, 2022 WL 2211527, at *7 (N.D. Ala. June 21, 2022) (denying qualified immunity where "Wilder, even if he was still holding a knife, made no

While factually similar precedent is not always required, the facts of those cases are similar in every material respect to Plaintiffs' view of the facts in this case.  As observed by Plaintiffs' expert, the video shows Ms. Moss crossing the room in the general direction of the officers but not attempting to stab them with the "knife" – which was not a knife at all, but a saw-toothed tool used for cutting sheetrock by repetitive back-and-forth motions, in sharp contrast (no pun intended) to the menacing edged weapons described in the case law.  (R. 31-3 at 4,7,11, 13). The boundaries of the law are clearly defined by these cases, and a jury must interpret the facts and determine which side of the line this case falls on.

B. **Reasonable jurors could find that Defendants failed to make reasonable accommodation for her obvious mental disability under the ADA.**

Many individuals who come into contact with law enforcement officers, and perhaps most who are killed by police while engaging in bizarre behavior, are cursed with a mental illness that constitutes a protected disability under federal law. Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be … denied the benefits of the services, programs or activities of a

---

threatening moves towards the officers"); *Hernandez v. City of N. Miami Beach, Fla.*, No. 08-20724-CIV, 2009 WL 10700664, at *5–6 (S.D. Fla. Aug. 27, 2009) (**denying qualified immunity where subject refused to drop knife in "small cluttered bedroom" and disputed facts about whether subject made "overt arching movement")** (emphasis added).  Even in the absence of controlling precedent, the Supreme Court says that the law be clearly established by "a consensus of cases of persuasive authority" from other jurisdictions, although this Court has not made a habit of doing so. *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

public entity, or be subject to discrimination by any such entity." 42 U.S.C. §12132.   An earlier statute, the Rehabilitation Act of 1973, provides similar protections in the context of federally funded programs, and both Acts are construed interchangeably because "the same standards govern discrimination claims" under both statutes.  *Allmond v. Akal Sec., Inc.*, 558 F. 3d 1312, 1316, n. 3 (11th Cir. 2009).  It is a fair question to ask whether those legal protections apply to the provision of law enforcement services to mentally ill persons, and the Supreme Court has granted *certiorari* on that issue – only to dismiss it as improvidently granted when the parties to that case failed to challenge the applicability of the ADA in their briefing.  *City and County of San Francisco v. Sheehan*, 575 U.S. ___, 135 S. Ct. 1765 (2015).

Like this case, *Sheehan* involved the shooting of a mentally ill individual.  In *Sheehan*, cert was granted on the question of whether §12132 "requires law enforcement officers to provide accommodations to an armed, violent, and mentally ill suspect in the course of bringing the suspect into custody."  *Id.* at 1767 (syllabus).

> Certiorari was granted on the understanding that San Francisco would argue that Title II of the ADA does not apply when an officer faces an armed and dangerous individual. Instead, San Francisco merely argues that Sheehan was not "qualified" for an accommodation, §12132, because she "pose[d] a direct threat to the health or safety of others," which threat could not "be eliminated by a modification of policies, practices or procedures, or by the provision of auxiliary aids or

services," 28 CFR §§35.139(a), 35.104. This argument was not passed
on by the court below.

*Id*.  For that reason, the grant of *certiorari* on that issue was dismissed as

improvidently granted, leaving only the Fourth Amendment issue to be decided.

On that claim, the Court held that it was not clearly established in 2008 that the

Fourth Amendment requires police to take special precautionary steps to

accommodate the mental disability of a person whom they are trying to subdue –

ruling that the San Francisco officers had qualified immunity from the claim that

the Fourth Amendment requires such an accommodation, without reaching the

substantive merits.  It is now 2023 and the law enforcement profession has come a

long way in understanding mental illness and training officers to account for it in

their encounters with mentally disturbed individuals.

Appellants concede that the Eleventh Circuit has ruled against other attempts

to allege ADA violations in tandem with Fourth Amendment claims, but counsel

cannot waive this argument in the event this case goes up the appellate ladder.

Counsel is aware that at least one panel of this Court has ruled there is no

*respondeat superior* claim under Title II of the ADA – which is the sole basis for

the claim against the Oconee County Sheriff in this case.  *Ingram v. Kubik,* 30

F.4th 1241 (11th Cir. 2022). However, the Circuits are split on that issue, with the

Fourth, Fifth and Ninth Circuits ruling that there *is respondeat superior* liability

and only the Sixth Circuit siding with the Eleventh on that issue. *Compare Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001); *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 574–75 (5th Cir. 2002); *Rosen v. Montgomery Cnty.*, 121 F.3d 154, 157 n.3 (4th Cir. 1997); and *Jones v. City of Detroit*, 815 F. App'x 995 (6th Cir. 2020). Because the Supreme Court will ultimately have to decide that issue, Plaintiffs' counsel cannot abandon it in this case — especially not after the high court's expression of interest in *Sheehan*.

In the event cert is granted in this or a similar case, it is likely that the Solicitor General would side with Plaintiffs' position given that the Department of Justice has already gone on the record in another case where a Statement of Interest was filed on behalf of the United States of America.[3] *Lou v. Lopinto*, No. 2:21-cv-00080-WBV-DPC, Doc. 197 (W.D. La. 05/12/23) (a copy of which is in the record at R-31-1). In that Statement, the federal government takes the position that the provision of police services is covered by the ADA, and that the exigent circumstances exception to the reasonable accommodation requirement only

---

[3] A similar dynamic took place in *Hope v. Pelzer*, 536 U.S. 730 (2002) where the DOJ had previously sent enforcement letters to the Alabama Department of Corrections objecting to its use of the "hitching post" to punish prisoners, which caused the Solicitor General to side with the plaintiff (represented by the undersigned counsel) to be consistent with past DOJ positions.

applies in narrow circumstances. While the so-called *Hainze*[4] exception may protect an officer faced with an advancing suspect with a weapon – if the jury believes that happened in this case – it would not apply to the initial encounter in which the officers had time to use de-escalation techniques to calm and avoid provoking a mentally ill person who was not posing any imminent threat at that time.

Here are pertinent excerpts summarizing the DOJ's position:

Law enforcement entities are subject to Title II's anti-discrimination mandate with respect to all of their operations, including interactions with the public… Thus, "activities" under Title II include everything a law enforcement agency does, including its emergency response services, interactions with or detention of members of the public, and making arrests.

(R. 31-1 at 8),

Second, the exigent circumstances standard set forth in *Hainze* does not bar Plaintiffs' Title II claim. Under *Hainze*, the Fifth Circuit held that Title II only applies to an officer's on- the-street responses to reported disturbances after the officer has secured the scene and ensured that there is no threat to human life. *Hainze*, 207 F.3d at 801. Once the scene is secure and no threat to human life exists, law enforcement officers must make reasonable modifications to accommodate an individual's known or obvious disability-based limitations. *Id.* at 802; *Windham v. Harris Cty.*, 875 F.3d 229, 237-38 (5th Cir. 2017). **Here, record evidence supports Plaintiffs' claim that the scene was secure early on in Defendants' response. Indeed, the record includes evidence that could support a conclusion that the scene was secure the entire time. The record further contains ample evidence to support that Defendants knew,**

---

[4] *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000).

**or it was obvious, that the child had disability-based limitations. There is also evidence that Defendants could have provided any number of reasonable accommodations once the scene was secure, and thereby afforded the child a safe and effective law enforcement response. As such, *Hainze* should not apply as a matter of law.**

(Id. at 2-3) (emphasis added)

In any event, this Court has ruled that claims under the ADA – which applies on its face to all state and local government activities – are not barred by the Eleventh Amendment. *Nat'l Ass'n of the Deaf v. Florida*, 980 F.3d 763 (11th Cir. 2020) (ADA abrogated the 11th Amendment where the issue was discrimination in the right to vote). Moreover, the fact that a Georgia sheriff may be acting on behalf of the state rather than the county for purposes of municipal liability under *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978) does not mean that the sheriff is a state official for purposes of the ADA even if the Eleventh Amendment did apply. *See, generally*, *Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) (*en banc*). Either way, there would be no basis for granting summary judgment to the Oconee County Sheriff if this Court's *respondeat superior* ruling in *Ingram* were to be overruled or revisited.

C. **Reasonable jurors could find that the Defendant deputies committed state law torts and constitutional violations for which they are not entitled to official immunity**

*1. State law tort claims*

It is axiomatic that the unjustified use of deadly force constitutes the state law tort of battery, just as the use of more force than reasonable under the circumstances is negligence. *See* O.C.G.A. §51-1-13 and §51-1-14 (recognizing cause of action for battery); O.C.G.A. §16-3-21(justification for self-defense). In addition to its own version of the Fourth Amendment (Ga. Const. Art. 1, §1, ¶1), the Georgia Constitution also has a separate provision which stating that no person shall "be abused in being arrested…" Art. 1, §1, ¶17. That provision – which has been construed as imposing a duty on an arresting officer to refrain from unlawfully assaulting a suspect – implicitly incorporates the state's criminal and tort law on assault, battery, and self-defense when it comes to drawing the line between lawful and unlawful force. While there are cases which have declined to find a private right of action to sue for violations of the Georgia Constitution, the Georgia Court of Appeals has upheld a state constitutional claim in the context of a police shooting. *See Porter v. Massarelli*, 303 Ga. App. 91, 692 S.E.2d 722 (2010).

The Georgia Supreme Court makes clear that the legal justification for a police shooting must be evaluated under O.C.G.A. §16-3-21, the state's self-

defense statute:

> [A]n officer who, in the performance of his official duties, shoots another in self-defense is shielded from tort liability by the doctrine of official immunity. One who acts in self-defense does not act with the tortious intent to harm another, but does so for the non-tortious purpose of defending himself. OCGA § 51-11-1… **Thus, if Appellees shot Gaddis intentionally and without justification, then they acted solely with the tortious "actual intent to cause injury."** *See Gardner v. Rogers*, 224 Ga. App. 165, 169(4), 480 S.E.2d 217 (1996). On the other hand, if Appellees shot Gaddis in self-defense, then they had no actual tortious intent to harm him, but acted only with the justifiable intent which occurs in every case of self-defense, which is to use such force as is reasonably believed to be **necessary** to prevent death or great bodily injury to themselves or the commission of a forcible felony. OCGA §§16-3-21(a), 51-11-1.

*Kidd v. Coates*, 271 Ga. 33, 34, 518 S.E. 2d 124, 125 (1999) (emphasis added).

In other words, Georgia law requires that deadly force not only be reasonable, but that it also be "*necessary*" for the defense of self or others. O.C.G.A. §16-3-21(a). In other words, if there were available alternatives other than the use of deadly force then the shooting would be a tort under Georgia law even if it were subject to qualified immunity under federal law. Construing all facts and inferences in favor of the Moss children as required by Rule 56, reasonable jurors could conclude that it was not "necessary" for Deputy Henderson to shoot their mother six times, if at all. To the extent that Defendants' arguments are legitimate, they need to be made to a jury.

Rather that conferring qualified immunity to officers based on whether they

violated clearly established law, Georgia's official immunity defense is based not on the clarity of the law but on whether the conduct was ministerial or discretionary – or, in the context of an admittedly discretionary function like the use of force, whether the officer acted with actual malice in using more force than necessary. *Merrow v. Hawkins,* 266 Ga. 390, 467 S.E. 2d 336 (1996)*; see also Adams v. Hazelwood*, 271 Ga. 414, 520 S.E. 2d 896 (1999). The term 'actual malice' has an arcane meaning in this context which is somewhat counterintuitive but clearly defined by case law.

The Georgia Supreme Court made clear in *Kidd v. Coates*, *supra,* that the defense of official immunity does not apply where an officer shoots someone intentionally *and* without justification – irrespective of the officer's subjective feelings when doing so – presumably because the officer is charged with knowledge of what constitutes justification to take a life, and a deliberate decision to take such action is sufficient for a jury to infer malice. In short, if an officer shoots someone in self-defense, he is not acting with actual malice and is entitled to official immunity. But if he uses deadly force without justification, he is acting with actual malice and is not entitled to official immunity. 271 Ga. at 34, 518 S.E. 2d at 125.

Under *Kidd v. Coates* and the *Gardner v. Rogers* case cited therein, this is a jury question if – as in the case at bar – there is evidence from which a jury could

34

find that the shooting was both intentional and unjustified. "[I]f [Deputy Henderson] shot [Julia Moss] intentionally and without justification, then [he] acted solely with the tortious 'actual intent to cause injury'" and he is not entitled to official immunity. *Dekalb County v. Bailey*, 319 Ga. App. 278, 736 S.E.2d 121 (2012) (citing *Gardner*, 224 Ga. App. at 169). While the ultimate holding of *Kidd* was that the shooting was justified in that case and thus the officer had official immunity, the holding of *Gardner* was that there was a jury question. 224 Ga. App. at 169, 480 S.E.2d 217; *see also Porter v. Massarelli*, 303 Ga. App. 91, 93, 692 S.E.2d 722, 724 (2010) (no official immunity for officer who testified that he shot motorist who was attempting to run over him during a traffic stop when there was jury question as to whether officer acted reasonably). *Porter* has been cited with approval by several federal courts, including this one. *See Dyksma v. Pierson*, No. 4:17-cv-00041-CDL, slip op. at 29 (M.D. Ga. 7/16/18), *affirmed per curiam*, No. 18-13337 (11th Cir. 4/18/19); *see also Bohanan v. Paulding Cnty.*, 479 F. Supp. 3d 1345 (N.D. Ga. 2020). Under the view of facts most favorable to Plaintiffs, Deputy Henderson is not entitled to official immunity on summary judgment for shooting Ms. Moss.

## 2. State constitutional claims

Like its federal counterpart, the Georgia Constitution contains a Bill of Rights that limits the power of law enforcement officers over individual citizens by

enumerating certain rights which officers must respect in the performance of their duties.  (Ga. Const. Art. 1, §1). Officers owe a duty to the public to obey the Georgia Constitution and refrain from violating it in their interactions with citizens.  While Georgia has no equivalent of 42 U.S.C. §1983 creating a private right of action for constitutional violations, its statutory tort law scheme expressly recognizes a private right of action for any breach of legal duty resulting in injury to a citizen.  As stated in the previous section of this brief, this Court has already recognized such a right of action in the context of police shootings.  *Porter*, 303 Ga. App. 91, 692 S.E.2d 722.

*Porter* has not only been cited for its holding on official immunity under Georgia law, but also for the proposition that violations of the Georgia Constitution are actionable as torts:

> … Defendants point out that at least one panel of the Georgia Court of Appeals has cast doubt on whether a plaintiff may bring claims directly under the Georgia Constitution. *See Draper v. Reynolds*, 629 S.E.2d 476, 478 n.2 (Ga. Ct. App. 2006) (noting "that Georgia does not have an equivalent to 42 U.S.C. § 1983"). But another panel of the Georgia Court of Appeals declined to grant summary judgment on a plaintiff's claims under the Georgia Constitution. *Porter v. Massarelli*, 692 S.E.2d 722, 726–27 (Ga. Ct. App. 2010). The Court thus assumes for purposes of this motion that Plaintiffs may assert claims under the Georgia Constitution.

*Dyksma*, No. 4:17-cv-00041-CDL at *29, fn. 6.[5]

---

[5] *But see Collins ex rel. Deloach v. Schantz*, No. A23A0741 (Ga. App. 9/26/2023),

The notion that violation of a constitutional right gives rise to an action in tort is consistent with the principle, enshrined by the Legislature, that "[f]or every right there shall be a remedy; every court having jurisdiction of the one may, if necessary, frame the other." O.C.G.A §9-2-3. While it is an oft-stated platitude of federal law that the United States Constitution is not 'a font of tort law,'[6] the state's Legislature suggests that is not the case when it comes to the rights of citizens and duties of state actors under Georgia's Constitution. *Id.* That concept is also embraced by Georgia's tort law, which expressly provides as follows:

> A tort is the unlawful violation of a private legal right other than a mere breach of contract, express or implied. A tort may also be the violation of a public duty if, as a result of the violation, some special damage accrues to the individual.

O.C.G.A. §51-1-1. Accordingly, a tort is committed when either a legal right is violated or a legal duty is breached, either of which can be established at the constitutional level. Furthermore,

> When the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, **although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby**.

---

*cert. denied* (Ga. 2024) (affirming denial of summary judgment as to state tort claims but not as to state constitutional claims) (Land, J., who is coincidentally the brother of the district court judge who decided both the instant case and *Dyksma*).

[6] *See, e.g., Paul v. Davis*, 424 U.S. 693, 700–01 (1976).

O.C.G.A. §51-1-6 (emphasis added).

Since the foundational document of Georgia law – the Bill of Rights contained in the state Constitution – commands officers of the state to refrain from unreasonable seizures (Art. 1, §1, ¶1) and abuse of suspects in the course of an arrest (Art. 1, §1, ¶17), the above code section explicitly recognizes a private right of action under which "the injured party may recover for the breach of such legal duty if he suffers damage thereby." By way of comparison, the language of 42 U.S.C. §1983, a state actor who subjects a party "to the deprivation of any rights, privileges, or immunities secured by the [federal] Constitution and laws" "shall be liable to the party injured in an action at law."  There is materially no difference between §51-1-6 (which explicitly creates a private right of action for damages caused by breach of a public duty) and Section 1983 (which explicitly provides a private right of action for damages caused by "the deprivation of any rights … secured by the Constitution").

Nothing in Georgia's tort law suggests that the breach of a constitutionally imposed duty is treated any differently than any other legal duty.  While the Constitution does confer immunity from tort liability upon public officials subject to certain exceptions, the same exceptions apply for state actors irrespective of whether the duty in question is imposed constitutionally, statutorily, or by some other standard of care.  Accordingly, a public duty may arise from a statute or

constitutional provision, and the violation of that duty may give rise to a tort claim which is subject to all manner of tort defenses, including official immunity.

For purposes of §§51-1-1 and 51-1-6, "[a] public duty is one owing to a general class of persons, regardless of any relationship that may exist between the actor and any class member."  Adams & Adams, Ga. Law of Torts (1998 ed.), §1.2(b) (citing *Georgia R. & Banking Co. v. Sewell*, 57 Ga. App. 674(6), 196 S.E. 140 (1938)).  O.C.G.A. §51-1-7 goes on to explain the circumstances under which breach of public duty becomes an actionable tort:

> Injury suffered in common with the community, though to a greater extent, will not give a right of action to an individual for the infraction of some public duty.  In order for an individual to have such a right of action, there must be some special damage to him, in which the public has not participated.

O.C.G.A. §51-1-7.

O.C.G.A. §§51-1-6 and 51-1-7 resemble Section 1983 in that they themselves are not sources of substantive rights, but merely authorize suit for violations of independent rights and duties enunciated elsewhere.  Just as Section 1983 provides a mechanism for enforcing rights and privileges guaranteed by federal law, §§51-1-6 and 51-1-7 recognize that a claim for damages can be brought to enforce duties "found in another legislative enactment." *Walker v. Oglethorpe Power Corp.*, 341 Ga. App. 647, ___, 802 S.E.2d 643, 656-57 (2017).  By definition, the phrase 'legislative enactment' includes constitutional provisions

as well as statutes.

While general statements of legal principle may not give rise to a cause of action unless they articulate a standard of care, the Georgia Bill of Rights' prohibition of unreasonable seizures (Art. 1, §1, ¶1) does impose a reasonableness standard specific enough to define the contours of a public duty enforceable in tort. *Compare Wells Fargo Bank, N.A. v. Jenkins*, 293 Ga. 162, 164, 744 S.E.2d 686, 688 (2013) (statute in question did not "articulate or imply a standard of conduct or care, ordinary or otherwise") (citing *Cruet v. Emory University*, 85 F. Supp. 2d 1353, 1355 (N.D. Ga. 2000) ("for a plaintiff to invoke O.C.G.A. § 51-1-6, there must be the alleged breach of a legal duty with some ascertainable standard of conduct."). That is consistent with the Legislature's pronouncement in O.C.G.A §9-2-3 that for every right, Georgia law provides a remedy, with the paramount source of rights being the Constitution.

Appellants acknowledge that the same official immunity defense that applies to tort claims would also apply to claims for breach of a state constitutional duty – which are themselves tort claims under O.C.G.A. §51-1-1 and 51-1–6 – but that official immunity does not apply under the facts of this case for the reasons previously stated. For this reason, the state law claims are not dependent on the clarity of prior law and are frankly more likely to overclaim official immunity than the federal claims are to overcome qualified immunity. But it should be noted that

40

if summary judgment is only reversed as to the state law claims, the case would remain in the district court because there is complete diversity between the parties since Reico Watts is domiciled in Florida and Dwight Moss lives in North Carolina while the Defendants all reside in Georgia.

## **CONCLUSION**

For the reasons set forth in the foregoing argument of law and citation of authority, Appellants request that the judgment of the trial court be reversed.  But even if Court is not convinced that the Fourth Amendment law is clearly established, Appellants respectfully request that the Court *at least* rule that the facts support a Fourth Amendment violation when viewed in the light most favorable to Appellants – even if the applicable law is not sufficiently clear to defeat qualified immunity, so that the law can be clearly established for future cases when such senseless tragedies continue to occur.  If the Court were so inclined and were to affirm the grant of qualified immunity on the federal claims under the 'clearly established' prong of the *Saucier/Pearson* analysis, Appellants would further request that the case be remanded for trial on the state law claims, which are governed by an entirely different body of law for the reasons discussed in the previous section.

Respectfully submitted this 5th day of April, 2024.

/s/Craig T. Jones
CRAIG T. JONES
Attorney for Appellants
Georgia Bar No. 399476

CRAIG T. JONES, P.C.
Post Office Box 66
Savannah, Georgia 31402
(678) 643-0062
craigthomasjones@outlook.com

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing Brief of Appellants complies with the 13,000-word limit set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, as modified by 11th Cir. Rule 32-4. From the caption reading "Statement Regarding Oral Argument" to the last sentence of the "Conclusion," this Brief contains exactly 8,270 words according to Microsoft Word's word-count function, printed in Times New Roman 14-point typeface.

/s/ Craig T. Jones
Craig T. Jones
Ga. Bar No. 399476
Attorney for Appellants

## CERTIFICATE OF SERVICE

I hereby certify that I have on this the 5th day of April, 2024 I served the foregoing Brief of Appellants upon the following counsel of record via the Court's electronic filing system and First Class U.S. Mail:

Terry Williams, Esq.
WILLIAMS & WAYMIRE, LLC
Building 400, Suite A
4330 South Lee Street
Buford, GA  30518

*/s/ Craig T. Jones*
CRAIG T. JONES
Georgia Bar No. 399476
Attorney for Plaintiffs

CRAIG T. JONES, PC
Post Office Box 129
Washington, GA 30673
(678) 643-0062
craigthomasjones@outlook.com